**FILED**

OA 91   Criminal Complaint

# United States District Court

OCT 3 1 2007

_____NORTHERN_____ DISTRICT OF _____CAILFORNIA_____

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
V.

MEHRDAD HAKIMIAN,
EMMA DEGUZMAN,
ALDY ANTONIO, and
BOBBY GUINTO,

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

Case Number: _____

4 - 07 - 70654

**WDB**

**EMC**

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief. On or about _From 11/1999-12/2006_ in _Alameda_ County, in
    (Date)
the _Northern_ District of _California_ defendant(s) did,

(Track Statutory Language of Offense)

did conspire to commit wire fraud, and did commit wire fraud, by overcharging insurance companies for the replacement of windshields and windows in the name of the business, Glass Emporium of Marin, Inc., and its subsidiaries, Glass Pro and Glass Masters, Oakland, California.

in violation of Title _18_ United States Code, Section(s) _371 (conspiracy) and 1343 (fraud)_ .
I further state that I am a(n) _FBI Special Agent_ and that this complaint is based on the
    Official Title
following facts:

SEE ATTACHED AFFIDAVIT OF FBI SPECIAL AGENT WILLIAM J. LEONI

PENALTIES: See Attached Penalty Sheets

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

Approved
As To
Form: STEPHEN G. CORRIGAN
AUSA

WILLIAM J. LEONI
Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

_10/31/07_
Date

at _San Francisco, California_
    City and State

EDWARD M. CHEN        U.S. Magistrate Judge

Name & Title of Judicial Officer

Signature of Judicial Officer

Document No.

District Court
Criminal Case Processing

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

The undersigned, William J. Leoni, being duly sworn, hereby declares and says:

1. I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been so employed since May of 1995. In accordance with my duties as such, I am assigned to investigate violations of federal law occurring in the Northern District of California, including wire fraud, mail fraud, insurance fraud, and money laundering. During my career with the FBI, I have primarily investigated violent crime, organized crime/drugs, and white collar crime matters.

2. I am a graduate of the University of Kansas where I earned a Bachelor of Arts degree in 1985 and of the University of Missouri-Kansas City where I earned a Master of Science degree in 1991. In 1995, I successfully completed New Agents' Training at the FBI's training academy at Quantico, Virginia. Since 1999, I have been assigned to a squad responsible for investigating a wide variety of white collar crime matters, including insurance fraud, wire fraud, and mail fraud. I received specialized training in insurance fraud investigations by attending an FBI Insurance Fraud In-Service, May 15-19, 2000, at Quantico, Virginia.

3. This affidavit is offered in support of a Criminal Complaint. As set forth more fully below, there is probable cause to believe that from a time unknown, but no later than in or about November 1999, and continuing until in or about December 2006, MEHRDAD "TONY" HAKIMIAN, EMMA DEGUZMAN, ALDY ANTONIO, AND BOBBY GUINTO, engaged in a conspiracy to commit wire fraud and committed wire fraud in violation of United States Code, Title 18 § 371 and § 1343, through their employment at Glass Emporium of Marin, Inc. (GEMI), and its subsidiaries, Glass Pro (GP) and Glass Masters (GM), headquartered at 1276 West Grand Avenue, Oakland, California. Based upon my investigation, there is probable cause to believe that GEMI's owner, HAKIMIAN,

1

instructed his regional and district managers to fraudulently inflate invoices at the local shops and instructed employees at GEMI's corporate headquarters, including ANTONIO, DEGUZMAN, and GUINTO, to electronically revise invoices to fraudulently reflect that a higher grade/more costly automotive windshield or window had been installed when, in fact, a standard grade/less costly windshield or window had been installed. These invoices were in turn submitted electronically to insurance companies or to third party administrators (primarily Lynx Services of Fort Myers, Florida, and Safelite of Columbus, Ohio) acting on behalf of the insurance companies for processing and payment via electronic funds transfers (EFT).

## STATUTORY AUTHORITY

4. Title 18 U.S.C. § 371, Conspiracy, makes it a felony offense:

"If two or more persons conspire to commit any offense against the United States ... in any manner or for any purpose, and one or more persons do any act to effect the object of the conspiracy...."

Title 18 U.S.C. § 1343, the wire fraud statute, states:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false and fraudulent pretenses... transmits, or causes to be transmitted by means of wire ... in interstate or foreign commerce, any writings, signs, or signals ... for the purpose of executing such schemes or artifices...."

5. The facts and information in this affidavit are based upon my personal knowledge and participation in this investigation, witness interviews, information and reports obtained from other Special Agents of the FBI, information and reports obtained from the National Insurance Crime Bureau (NICB), and information and reports obtained from the State Farm Insurance (SFI)-Special Investigations Unit (SIU). This affidavit does not include every fact or all information that the Government has concerning the possible commission of conspiracy and wire fraud offenses.

//

## BUSINESS BACKGROUND

6. According to its Website, www.autoglass4u.com, GEMI is one of America's premiere auto glass service companies. The Website contains various information about GEMI, and its subsidiaries, GP and GM. On 10/19/2006, the site claimed that the business had been in operation for the past 14 years and had over 100 service centers nationwide in 23 states. However, under the "Locations" section of the Website, only 75 locations in 22 states were noted. The Website also noted that GEMI's "corporate office" was located at 1276 West Grand Avenue, Oakland, California.

7. Information obtained from Dunn & Bradstreet, Inc., a publicly-available database containing various business information, revealed that GEMI is a commercial and residential retail auto glass business which was incorporated on 02/17/1995 (registration identification number C1920947) with the California Secretary of State, Corporations Division, Sacramento, California. The president and registered agent of record is Mehrdad HAKIMIAN, 1276 West Grand Avenue, Oakland, California.

## INFORMATION PROVIDED BY A CONFIDENTIAL SOURCE (CS)

8. On 05/27/2005, a confidential source (CS-1) approached the FBI and provided information regarding a possible insurance fraud scheme involving a nationwide automobile glass replacement business known as Glass Masters (GM). CS-1 advised that Tony HAKIMIAN owned and operated GM, which had over sixty stores located throughout the United States, from GM's corporate headquarters located in Oakland, California, and that some of the stores throughout the country may also be doing business under the name Glass Emporium of Marin, Inc. (GEMI).

9. CS-1 was subsequently interviewed by the FBI on 08/31/2005, 01/12/2006, and 10/12/2006. In summary, CS-1 provided the following information:

    a. Through CS-1's employment at one of GM's local shops in the southeastern portion of the United States, CS-1 discovered that billing information was improperly being changed at the

corporate level before being submitted for payment to insurance companies. CS-1 explained that all GM stores located throughout the country are electronically linked to the corporate office via a computer system called DialMark and the company utilizes a computerized billing system. After a "job" is closed on the company's computer system, an employee with access to the system is then able to view the "archive" section of the system and review the history of a particular invoice. In late 2004, while accessing this system, CS-1 discovered that invoices had been changed at the corporate office to reflect that more expensive windshields had been installed on vehicles than were actually installed. In addition, in many instances expenses for installation materials such as filler, molding, or adhesive were added to invoices even though at times, those items were never used or replaced, or which should have been included in the cost of the windshield.

 b. In approximately November 2004, CS-1 began to notice that there were several "voids" or "negative transactions" for several of the jobs that had been completed at CS-1's local GM store, indicating to him/her that the sales data entered by the local shop had been deleted and new sales data had been substituted. Initially, CS-1 thought perhaps he/she had entered the sales' information into the computer system improperly and that personnel at the corporate office in Oakland had subsequently accessed and revised the data in order to correct the perceived errors. However, after noticing that numerous records had been electronically revised in this manner, CS-1 telephonically contacted GM corporate offices in Oakland and at different times spoke with "Bobby" and "Aldy" (last names unknown), two "accounting people" who were responsible for billing for all GM stores throughout the country. In referring to "Bobby" and "Aldy", I believe CS-1 is referring to Bobby GUINTO and Aldy ANTONIO.

 c. On one occasion in February 2005, CS-1 telephonically spoke with Bobby and advised that he/she had noticed that on several invoices, incorrect part numbers for various windshields were

4

listed on the electronic invoices which did not reflect the actual types of windshields that had been installed on vehicles at his/her shop. In each instance, a more expensive windshield was now listed on the electronic invoice. CS-1 asked Bobby about a particular claim which appeared to have been revised. Initially, Bobby told CS-1 that the more expensive windshield had, in fact, been installed on the vehicle but CS-1 refused to accept this explanation. Ultimately, Bobby admitted to CS-1 that the change had been made at the corporate office so that the company could make more profit and Bobby's general attitude was essentially, "If we can get from the insurance companies, we are going to get from the insurance companies." This and other comments made by Bobby during this telephone conversation lead CS-1 to believe that these revisions of invoices were not accidental but rather intentional acts designed to overcharge insurance companies.

d. On another occasion, CS-1 spoke to Aldy and explained that for many of the claims he/she reviewed, GM had billed separately for installation material such as "filler" which should have been included in the price of the windshield. Aldy informed CS-1 that although this was true, it was an "acceptable attachment" that the insurance companies would pay for and thus GM would bill for it.

e. At this point, CS-1 suspected that GM was intentionally "doing illegal things" and he/she attempted to document some of the suspected fraud by printing out some of the changed computerized records and photocopying them. However, because CS-1 was unsure if his/her computer activity could be monitored by employees at GM headquarters since the computer system was linked, he/she limited his/her investigative activity and did not attempt to do a comprehensive review of all of the invoices generated at his/her shop.

10. On 05/27/2005, CS-1 provided the FBI with paperwork representing ten examples of billing irregularities, all pertaining to automobile windshield repairs or replacements occurring at his/her

5

local GM shop in the southeastern portion of the United States between December 2004 and July 2005. The materials provided by CS-1 included various information concerning each billing irregularity, including a photocopy of the original work order signed by the customer, and listing, by product part number, the true windshield type installed on the vehicle; a printout of a computer record of the invoice history from the GM computer system reflecting a "void" or "negative transaction" for a particular invoice; and a printout of a computer record of the same transaction now erroneously reflecting that a more expensive windshield had been installed and/or additional expenditures for installation materials had been added.

11. A review of these 10 billing irregularities revealed that in four instances, the part number for the windshield type had been changed at the corporate office in Oakland, California to reflect that a more expensive windshield had been installed. In one instance, the windshield price had been inflated although the part number remained the same. In three of the five instances in which the price of the windshield had been inflated, additional costs for installation materials had also been added.

12. A further review of the records provided by CS-1 revealed five other invoices in which the windshield part number and price had not been changed but which included additional costs for installation materials which were not part of the original invoice.

13. CS-1 advised that he/she spoke to three different GM District Managers about what he/she had uncovered and all three appeared to have prior knowledge of the fraudulent activity. When one particular District Manager was informed by CS-1 of the suspected fraudulent activity, he reportedly just shrugged his shoulders and said something to the effect of, "I know, they'll get in trouble for it one day."

6

14. CS-1 advised that at the end of each work day, all of the sales data (invoices) generated at the local shop was sent electronically to GM's corporate headquarters in Oakland. At CS-1's local GM shop, every day the paperwork was bundled up and placed in a clerical basket. At the end of the work week, on Friday, the paperwork was sent to GM headquarters in Oakland, California via U.S. Mail. The weekly paperwork included invoices/work orders, credit card slips, dealer receipts, time cards, and voided invoices.

15. It should be noted that of the ten (10) suspected fraudulent claims provided by CS-1, six different insurance companies were represented, including State Farm Insurance (SFI) (4), Farmers Insurance (2), Geico Insurance (1), Allstate Insurance (1), Erie Insurance (1), and Liberty Mutual Insurance (1).

## NOTIFICATION OF THE NICB AND SUBSEQUENT AUDIT BY STATE FARM

16. After receiving the information from CS-1 in May 2005, the FBI contacted Senior Special Agent (SSA) Jennifer Bramlett of the National Insurance Crime Bureau (NICB) and alerted her to the questionable billing activity possibly involving several NICB member insurance companies. Subsequently, SSA Bramlett contacted the Special Investigations Units (SIUs) of several major insurance carriers, including SFI, and advised them of the suspected fraudulent billing scheme.

17. In response, SFI-SIU initiated an internal investigation which was led by Claims Representative/Investigator Sherman Liddell. Liddell had previous experience investigating fraudulent automobile glass claims. On 10/10/2006, I spoke with Liddell about his investigation and he told me the following: GM, with 60-80 locations nationwide, is one of the larger glass businesses that installs vehicle windshield and windows for SFI. Liddell set out to investigate whether or not the pattern of irregular billing that CS-1 had detected in his/her area was also present in Liddell's area near Charleston, South Carolina. Initially, Liddell selected a "semi-random"

sampling of approximately 50 claims submitted by GM for windshield replacements. Visual inspections were completed of these vehicles to determine if the installed windshields were the ones for which SFI was billed. Liddell explained that this was a "semi-random" sampling because the claims he selected were from groups of claims that had characteristics of previous fraud schemes. Many of the claims were charged replaced of "target windshields," that is, rare and relatively high priced windshields such as the "Heads-Up Display" (HUD) or Ford Oval in Shade Band windshields. Liddell's inspection revealed that in many instances, different, less expensive windshields had been installed on vehicles than what SFI was billed for and ultimately paid GEMI. Liddell found that in about one-half or less of the cases, the claims were billed appropriately. For the claims that were billed inappropriately, the price difference ranged from twenty dollars to several hundred dollars per claim.

18. Based upon the results of this initial investigation of GM claims in this one store in Charleston, South Carolina, it was apparent to Liddell that GM was frequently billing SFI for more expensive glass than was actually installed on vehicles. Liddell then set out to conduct a broader investigation to determine if this pattern of billing "up-coding" existed in other parts of the country. Through an initial internal SFI database search, Liddell discovered that over the previous five years, GM had submitted approximately 60,000 claims to SFI. Liddell reasoned that it would be impracticable to inspect all 60,000 vehicles to determine if SFI had indeed been billed improperly. Alternatively, Liddell elected to again conduct an audit consisting of a random sampling of approximately 400 claims, this time including different GM locations around the country. Further, Liddell limited the scope of this "re-inspection" to only a few types of expensive "target windshields," namely HUD windshields primarily used on Buick and Pontiac automobiles, Ford Oval in Shade Band windshields used on Ford Broncos, Ranger and F-Series pick-up trucks, and "Export Only"

8

windshields used on Ford Explorers. Liddell explained that HUD windshields allow for the projection of the vehicle's speed and other information directly onto the windshield at eye level. These vehicles are distinctive in that they contain a shoe box-size cutout on the dashboard where the projector is located. The Ford Oval and Export Only windshields are made by Carlite and are "after market specialty dress-up windshields" which are never installed at the automobile factory.

19. As part of the re-inspection, Liddell ran a query to isolate all of the HUD claims submitted by GM for the previous 2-3 years. Using the vehicle identification numbers (VINs) for these isolated vehicles, he then segregated the claims involving vehicles for which claims had previously been filed with SFI. For many of these previous claims, SFI maintained photographs in their internal records which were reviewed by Liddell or others to determine if the cut out was present on the dashboard. If the cut out was not present, it indicated that the vehicle was never equipped with the HUD windshield and the replacement windshield could not possibly have been an HUD. In this manner, Liddell was able to determine if SFI had been over-billed without conducting an actual physical inspection of these vehicles.

20. Liddell then coordinated the physical re-inspection of the remaining vehicles by instructing SFI claims representatives to locate and inspect the identified vehicles for which GM had done glass replacements and billed SFI. During the initial nationwide re-inspection, 228 of the approximately 400 selected vehicles were located and inspected, either physically or via photographs as discussed above. These replacements were done by GEMI/GP/GM between August 2001 and August 2005. I obtained a written summary of the results of this physical re-inspection and it revealed the following:

    a. A total of 123 vehicles for which SFI was billed for replacing a Ford Oval in Shade Band windshield were inspected (part numbers DW1332, DW1335, and DW1343). The audit found that

in all 123 instances, a less expensive windshield, generally part numbers DW1099 or DW1317, had actually been installed.

b. A total of 10 vehicles for which SFI was billed for replacing "Export Only" windshields were inspected (part number DW1509). The audit found that in 9 of the 10 cases (90%), a less expensive windshield had actually been installed, generally part number DW1474.

c. A total of 95 vehicles for which SFI was billed for replacing a HUD windshield were inspected (encompassing 15 different part numbers). The audit found that in 89 of the 95 cases (93%), a non-HUD and less-expensive windshield had actually been installed.

21. With these figures, Scott Cleland, SFI-SIU Claims Representative, calculated the amount SFI was over-billed by GM in each instance and then extrapolated over the total sample size, numbering approximately 400 claims, and estimated the loss amount to be $104,568.81.

22. On 01/12/2006, in a meeting with the FBI and others, Liddell estimated that SFI had incurred losses of over $1,000,000 per year for just the Ford Oval in Shade Band windshield replacements for Ford Ranger and F-150 pick-up trucks.

23. In the latter part of 2006, I obtained an electronic version of the database SFI compiled during their re-inspections. I reviewed the details for 196 claims in which the vehicles were physically inspected and found to have had been improperly billed. The amount of over-billing for these 196 claims totaled $71,500.97, or approximately $365.00 per claim.

24. Liddell explained that it is very likely that GM had inappropriately billed SFI for other types of windows and windshields other than the three types listed above but he limited his audit and re-inspection to these three types due to a lack of resources. Liddell's objective was to identify a sufficient number of fraudulent claims to support an eventual civil lawsuit and purposely chose the most costly claims which would require the fewest number of physical inspections.

## ANALYSIS OF GEMI'S ELECTRONIC BILLING DATA

25. On 12/19/2006, a search warrant was executed by the FBI and United States Postal Service at GEMI's corporate headquarters in Oakland, California. During the search, it was discovered that GEMI maintained a computerized billing system which contained detailed information and data from invoices generated at all local GEMI shops. The system utilized a point-of-sale software program called DialMark specifically designed for the automobile glass industry. The information and data were stored in electronic format on a centralized computer server which was "imaged" by FBI personnel during the search and subsequently analyzed.

26. Upon further investigation, it was learned that employees at the corporate office in Oakland, California, could make changes to individual invoices on the DialMark system but that the program would not allow changes to be made to the price of an invoice. In order to make this type of price change, the employee would first have to void the original invoice and then create a new one with a new invoice number. These types of changes leave an "electronic footprint" on the system showing the changes made and by whom. Each GEMI employee was assigned a unique identification number on the DialMark system that was password protected and any changes that were made could be linked to the corresponding employee regardless of which computer terminal the employee was using.

## VOIDED INVOICES

27. Based upon the information and documents provided by CS-1, an attempt was made to isolate on the DialMark system those invoices which had been changed at the corporate office to reflect that a more expensive *glass* part was installed, or which *hardware* installation materials were added to the original invoice. Concerning the former, a search was conducted to identify those invoices which met all of the following criteria: a) an insurance job; b) a void history; c) the new invoice

11

reflected a new glass part number; d) the new glass part number was more costly than the original glass part; e) the original invoice was never submitted to an insurance company for payment. A similar query was run against the data to identify those invoices which had been voided and resulted in the substitution or addition of only hardware parts (glass part number remained the same). It should be noted that simply because an invoice was voided and resulted in an increased price billed to an insurance company, it does not necessarily or automatically indicate that the invoice was fraudulent. The revision may have been done at the corporate office to correct a legitimate error made by an employee entering the sales data at a local GEMI shop. However, based upon information gathered during interviews and visual inspections of vehicles conducted by SFI and FBI personnel, it is strongly believed that a significant proportion of these voided invoices are indeed fraudulent. It should also be noted that this method of identifying potentially fraudulent invoices (through voided and re-created invoices) does not take into account the fraudulent and inflated invoices which may have been created at local GEMI shops at the direction of Hakimian and local shop managers, as has been suggested by witnesses.

28. The "glass" query revealed over 2,700 potentially fraudulent invoices, totaling over $428,000.00 in inflated costs affecting 73 insurance companies. The insurance companies most frequently represented were State Farm (38%), Allstate (14%), Nationwide (8%), Geico (6%), Farm Bureau (5%), Farmers (5%), USAA (4%), and Progressive (4%).

29. The "hardware" query revealed over 3,100 potentially fraudulent invoices which met the search criteria, totaling more than $150,000.00 in inflated costs affecting 86 insurance companies. The insurance companies most frequently represented were State Farm (31%), Allstate (14%), Nationwide (9%), Farmers (7%), Geico (6%), USAA (5%), Farm Bureau (4%), and Progressive (4%).

12

30. Combined, more than 5,900 invoices met the search criteria, totaling more than $586,000.00 in potentially inflated costs billed and paid by insurance companies.

31. A further review of the data revealed that while 27 separate GEMI corporate employees were identified as having voided invoices that met the established criteria, the following three employees were responsible for creating nearly 89% of the voided invoices: Aldy ANTONIO (57%), Emma DEGUZMAN (21%), and Bobby GUINTO (11%). ANTONIO's voided invoices, numbering more than 3,300, resulted in an increase of more than $350,000.00 in reimbursements paid by insurance companies. DEGUZMAN's voided invoices, numbering more than 1,200, resulted in an increase of more than $140,000.00 in reimbursements paid by insurance companies. GUINTO's voided invoices, numbering more than 600, resulted in an increase of more than $50,000.00 in reimbursements paid by insurance companies.

32. A review of these voided electronic invoices revealed that a number of window and /windshield replacements were done at GEMI shops in the greater San Francisco Bay Area. This year, I participated with other agents in the visual inspection of several of these vehicles. We discovered that in nearly every instance, the invoice was incorrectly billed at a higher price. In some cases, the windshield type was incorrectly reported. In other cases, the revised invoice erroneously stated that the windshield contained a specialized solar tinting or was equipped with a rain sensor.

## FORD OVAL IN SHADE BAND WINDSHIELD

33. As stated above, in an audit and related physical inspection conducted by SFI of certain vehicles for which they were billed for the rare, Ford Oval in Shade Band windshield, it was discovered that in every instance (123), a less-expensive windshield had actually been installed. To assess the relative rarity and availability of this type of windshield, on 06/06/2007, I contacted Bryant Bailey, Operations Manager, Carlite Auto Glass, Allen Park, Michigan, who provided the following

13

historical information regarding two of the Ford Oval Band windshields, namely part numbers DW1332 and DW1335:

a) Part DW1332 came into existence on 05/12/2002. Carlite received 420 units from the manufacturer who was bound by contract to only produce this type of windshield for Carlite. Of the 420 units received, only **19** were ever sold, 90 were broken in the warehouse by accident, 7 were broken at various times elsewhere, and 304 remain on hand in inventory today.

b) Part DW1335 came into existence on 05/12/2002. Carlite received 840 units from the manufacturer who was bound by contract to only produce this type of windshield for Carlite. Of the 840 units received, 97 have been sold, 40 were broken, and 701 remain on hand in inventory today.

34. Due to this finding, I ran a query to identify those invoices which had been voided at the corporate office and which involved the substitution of one of the two Ford Oval windshield part numbers (DW1332 and DW1335) for the existing part on the original invoice. My query revealed that GEMI corporate personnel had voided, substituted , and then billed insurance companies for 205 DW1332s, resulting in a total price difference of more than $70,000.00 above the original amounts appearing on the original invoices. As stated above, only 19 of these types of windshields were ever sold anywhere in the world.

35. The query also revealed a total of 368 DW1335s had been voided, substituted, and then billed to insurance companies, resulting in a total price difference of more than $120,000.00. As stated above, only 97 of these types of windshields were ever sold.

36. The data show that of these 573 instances in which an original invoice was voided at the corporate office and part numbers DW1332 or DW1335 substituted, ANTONIO was responsible for 405 of them, resulting in a total price difference of more than $120,000.00. DEGUZMAN was responsible for 135 of them resulting in a total price difference of more than $60,000.00 and

GUINTO was responsible for 31 of the changes, resulting in a total price difference of more than $12,000.00.

37. I also ran a separate data query to determine if additional DW1332s and DW1335s had been billed to insurance companies but which were not part of the voided invoice data set. My query revealed that in all, more than 380 DW1332s and 760 DW1335s had been billed, roughly twice the number that had been isolated in the voided set. This suggests that approximately one-half of the Ford Oval Band windshields billed by GEMI were invoiced as such by personnel at the local shops before they were sent to the corporate office.

## INTERVIEWS OF FORMER GEMI EMPLOYEES

### Neal Schreiner

38. On 01/24/2007 and 06/13/2007, former GEMI employee Neal Schreiner was interviewed by the FBI. Schreiner advised that in 1999, he was hired by HAKIMIAN to manage the newly-opened store in Raleigh, North Carolina. In 2001, Schreiner was promoted to District Manager and was responsible for four shops. Approximately one year later, Schreiner was promoted to Regional Manager for the southeast region and was responsible for a very large territory and up to 32 shops. He remained in this position until he was terminated in October of 2006.

39. Schreiner was asked during the interviews if he were aware of instructions given by individuals in GEMI's management to change business records to overcharge customers and insurance companies. Schreiner stated that he knew individual stores were being told to make such changes, but he commented that he did not pay a lot of attention to the company's paperwork. Schreiner offered the example that GEMI's corporate office wanted stores to put in a regular windshield but bill for the installation of a premium windshield. Schreiner stated that the corporate office also

15

wanted stores to bill for molding and extra accessories. For example, stores were encouraged to include extra charges for molding on windshields that were already equipped with molding.

40. Schreiner stated that HAKIMIAN would call individual stores and instruct them how to bill for particular products and services, such as telling them to put in regular merchandise but to bill for premium products. Schreiner advised that he had many conversations with HAKIMIAN in which HAKIMIAN suggested that he cheat customers by overcharging and billing premium prices for regular merchandise. Schreiner stated that he was told by HAKIMIAN to, "make sure you train them (the store managers) like I want it done, to put in a cheap part and bill for a more expensive part." Schreiner stated that he knew this was wrong and he told his store managers not to operate in this manner. Schrenier stated that he instructed his store managers to let him know if they received calls from HAKIMIAN directing them to overbill customers and/or engage in other questionable practices. Schrenier told his store managers, "If they want to make changes (at the corporate office), let them do it." Subsequently, Schreiner received calls from store managers after being contacted by HAKIMIAN and instructed to overbill customers.

41. Schreiner identified an individual named Aldy (last name unknown) at GEMI's corporate headquarters who was responsible for making questionable changes to invoices on the company's computer system. Schreiner advised that Aldy worked in the Accounts Receivable Department at the corporate office. Schreiner advised that Aldy would call the individual stores and try to encourage them to bill higher prices and overcharge customers.

**Geena Herrera**

42. On 12/21/2006, I interviewed former GEMI corporate employee Estelita "Geena" Herrera. Herrera advised that from 10/21/2000 - 10/22/2003, she was employed as the Accounts Receivable Manager for GEMI, also known as GP, located at 1276 West Grand Avenue, Oakland, California.

16

As part of her duties as the Accounts Receivable Manager, Herrera was responsible for GEMI's entire billing process. Herrera explained that GEMI had contracts with Lynx and Safelite, two third-party administrators that handled billings for many of the major insurance companies. Included in the contracts were set pricing structures for each type of windshield.

43. Herrera advised that HAKIMIAN routinely instructed employees at both the corporate office and the local branches to bill for a higher priced part even though a lessor priced part had been installed on a vehicle when a customer was filing a claim with their insurance company. In addition, employees were instructed by HAKIMIAN to always bill for installation parts such as molding and clips regardless if they were actually used in the installation. Herrera explained that these directives were frequently communicated by HAKIMIAN to the regional and district managers during telephone conference calls in which she participated. These instructions would then be passed on to the branch managers at the local GEMI shops. At times, some of the managers would challenge HAKIMIAN, pointing out to him that the parts which were being invoiced and billed to insurance companies would not match their inventory records. HAKIMIAN purportedly told them, "Don't worry about the inventory. We'll take care of that" and added, "You guys do what I tell you to do."

44. Herrera advised that once an invoice was entered into GEMI's centralized automated billing system, employees at the corporate office could immediately access the data. HAKIMIAN instructed corporate employees who worked in the billing department to review the invoices submitted by the local shops each day to ensure that the highest priced glass and all possible charges for the installation parts had been selected. If not, Herrera and other corporate employees in the billing department were instructed by HAKIMIAN to revise the invoice by selecting the highest priced part possible regardless of what part was actually installed on the vehicle. Herrera recalled HAKIMIAN stating, "If you've got 10 parts, use the highest priced one that can be used." Despite

17

HAKIMIAN's instructions, Herrera stated that she and other GEMI corporate employees usually selected the first, second, or third highest priced part, "so as not to be so obvious." At times, HAKIMIAN would review the invoices being submitted for payment and ask the billing staff why they had not inflated some invoices or billed for additional parts.

Herrera acknowledged that at HAKIMIAN's directive, she engaged in the revision and inflation of the invoices as well as several other GEMI employees working under her supervision, including Aldy ANTONIO and others. ANTONIO was hired in 2000 and was initially placed in the collections department. Shortly thereafter, HERRERA trained ANTONIO on the billing process and he started to work in that area. Over time, she began to do fewer and fewer billings herself and ANTONIO did more of them.

45. Herrera stated that the revisions at the corporate office involved retrieving an existing invoice on the computer system and "voiding the ticket" and then creating another invoice which would include a change in the part number (and corresponding price) for the windshield and the addition of expenses for installation materials such as filler and clips which were not really used. The voiding of the invoice would create a "negative showing" on the computer system. The original work order for the job served as a cost estimate and was used by the installer for instructions. Herrera stated that these work orders contain the correct information regarding the part numbers for the equipment actually installed on the vehicles. The revised invoices contain inaccurate part numbers which were in turn used to bill insurance companies.

**Crystal Hardy**

46. On 01/11/2007, I interviewed former GEMI corporate employee Crystal Hardy. Hardy advised that from September 2002 until January 5, 2005, she was employed at GEMI's corporate headquarters in Oakland, California, and worked under the supervision of HAKIMIAN. Hardy

began her work at GEMI in the Audit and Accounts Receivable Departments. Her duties and responsibilities included reviewing all of the paperwork that was sent from the local GEMI branch locations to ensure that the amounts appearing on the invoices matched the payment amounts being submitted with the paperwork and which were ultimately deposited into the company's bank accounts. Hardy was also responsible for auditing the branch inventories to ensure that all of the parts purchased were actually being installed on vehicles or used to replenish the branch's supply stock. She would accomplish this by comparing the purchase records from glass vendors with branch installation invoices. Hardy stated that HAKIMIAN tasked her to conduct these inventory audits primarily because he was "paranoid" that employees were stealing from him. Hardy worked in this capacity until November 2003 when she moved to the GEMI Marketing Department and assisted in promotions.

47. Hardy advised that during her entire employment at GEMI, employees were routinely instructed by HAKIMIAN to invoice a higher priced part number than they actually ordered, and to install a lessor priced part in order to maximize profits for the company. Hardy stated that, "Tony said to do it this way" and that it was "his policy" which everyone within the company knew about. The average price difference between the actual price and the inflated price of a particular part was "$100.00 and up." HAKIMIAN also instructed employees to bill for molding and other installation materials regardless if those materials were actually used in the installation of the glass. Hardy stated that most molding does not need to be replaced when installing a new windshield and the existing material can be reused. HAKIMIAN, however, instructed his employees to replace the molding only when it was absolutely necessary, but to bill for new molding for each installation.

48. Hardy stated that the bulk of the price inflation occurred at the branch locations, before the invoices were sent to the corporate headquarters. However, at the direction of HAKIMIAN, changes

19

and additions were also made to invoices by employees at the corporate office, including Aldy (last name unknown), before they were submitted to insurance companies. Hardy explained that the GEMI branch, district, and regional managers were all instructed by HAKIMIAN to bill for a higher priced part number even though they knew a lessor-priced part had actually been installed.

49. Hardy stated that HAKIMIAN instructed branch managers to immediately ask a customer when he or she came into the shop or called for a price quotation if he or she intended to pay cash for their windshield replacement or if they intended to file a claim with their insurance company. As an incentive to have the customer file a claim with their insurance company, HAKIMIAN instructed his branch managers to offer to waive the customer's insurance deductible and this was routinely done. According to Hardy, this was advantageous to HAKIMIAN because he could then inflate the invoice to the insurance company. If a customer paid cash for the windshield replacement there was little opportunity to inflate the charges, except for perhaps adding installation materials which were never used.

50. Hardy stated that the branch, district, and regional managers were acting upon the explicit instructions of HAKIMIAN to inflate the invoices. Hardy advised that HAKIMIAN was aware of every issue and that, "Nobody does anything in the branch stores without Tony's authorization." At times, managers from the branch locations would call GEMI corporate headquarters and inquire about why some of their submitted invoices had been changed or inflated. At one point, Hardy had a discussion with HAKIMIAN about the managers' inquiries and he told her, "That's what I told them to do when they bill insurance."

51. Hardy advised that while conducting her inventory audits, she was able to confirm that inflated invoices were indeed being submitted to insurance companies. Higher priced parts which had never been purchased from vendors by GEMI were billed to insurance companies as having been installed

20

on vehicles. On a few occasions, an insurance company would telephone GEMI and inquire about an incorrect invoice. In these few instances, GEMI employees would correct the invoice and reimburse the insurance company, if necessary.

### OTHER PRIOR RELEVANT ACTS AND ALLEGATIONS

52. During the course of my investigation, I learned that in 1996, the State of California Department of Consumer Affairs (DCA) ordered the revocation of four automotive repair dealer registrations of Mehrdad HAKIMIAN, owner of TAGS Auto Glass stores in North Highland, Oakland, San Francisco, and San Jose, California after the DCA's Bureau of Automotive Repair (BAR) investigated numerous instances of insurance over-billing. The charges against TAGS Auto Glass were based on six undercover runs conducted by the BAR in 1993 and 1994 as well as seven consumer complaints. TAGS was accused of quoting one price to consumers and billing the customer's insurance company a higher amount. The DCA alleged that the insurance companies were being billed anywhere from two to five times more than the original quote and the average over-billing was $730.00.

53. I also learned that in 2000-2001, GM was the target of two insurance fraud investigations involving its local shops in Pensacola, Florida and Birmingham, Alabama, for billing irregularities. In 2000, a case was initiated and investigated by the Florida Department of Insurance-Division of Insurance Fraud (FDI-DIF), Pensacola, Florida, with assistance from SFI-SIU Claims Representative/Investigator Keith Pearce, regarding inflated claims. Another case was initiated in 2001 by SFI, again investigating GM for billing irregularities occurring at the Birmingham, Alabama store. These investigations, discussed more fully below, suggest that GM was previously engaged in similar fraudulent billing activity as seen in the instant investigation.

//

## PENSACOLA, FLORIDA INVESTIGATION

54. On 07/19/2000, Amy Ward, former manager of the GM shop in Pensacola, Florida, telephonically contacted the FDI-DIF and reported that one of GM's District Managers, Linda Cochran, was instructing employees to bill insurance companies for molding regardless of whether they actually installed it on vehicles.

55. On 07/26/2000, Ward and co-worker Tracy Duran were interviewed by FDI-DIF investigators Buddy Hand and Sandra Fitzsimons. During the interview, Ward and Duran reiterated that their supervisor, Linda Cochran, had told them to bill insurance companies for rubber seals whether or not the seals were actually installed on the vehicles. Also, when purchasing a replacement windshield, Ward and Duran were instructed to order and install a lessor-priced windshield on the vehicle while billing the insurance company for a higher-priced one. Cochran told Ward and Duran that these instructions were per GM's owner, Tony HAIK (sic).

56. On 08/23/2000, Ward and Duran were interviewed by SFI investigator Keith Pearce. I have obtained and reviewed a written transcript of this recorded interview. During the interview, Ward was asked to explain, in substance, the nature of her complaint and she stated:

> "We bill for windshields, for premium windshields, when we actually install the after market windshields. We bill for moldings that we actually do not use, or we use a universal molding for, and bill for a premium molding. And, in some cases bill for a molding when the actual windshield comes with the molding attachment. Uh, we're told to do that by our District Manager, which is informed by the owner of the company to tell us to do these things. It's been going on since I've been working there, since November of '99, and I'm sure it was long before that."

57. Ward also advised that these fraudulent billing practices were being done with every insurance company that GM bills, not merely SFI.

58. On 10/12/2000, SFI Claims Representative/Investigator Keith Pearce reported to FDI-DIF investigator Fitzsimons that SFI had conducted a physical inspection of 16-17 vehicles that had their

windshields replaced by GM. SFI employed an outside consultant who specialized in windshields to assist with the inspection. The specialist examined the invoices from GM and compared them to the part numbers appearing on the windshields that were selected for inspection. The specialist found that in approximately 6 or 7 of the cases, the windshields actually installed on the vehicles did not match the part numbers which appeared on the invoices. However, the specialist concluded that the windshields installed on vehicles were of the same quality for which SFI was billed. As such, SFI concluded that they had not been overcharged and closed their investigation into the matter.

## HUNTSVILLE, ALABAMA INVESTIGATION

59. On 08/27/2001, Keith Horzempa, former manager at GM's store in Huntsville, Alabama, was interviewed by SFI Claims Representative/Investigator George Mullins in relation to an investigation and I have obtained a written transcript of the recorded interview. During the interview, Horzempa advised that he was instructed to bill insurance companies for heated windshields even though unheated windshields were actually installed on the vehicles. These instructions came from three GM District Managers, including Linda Cochran, who told Horzempa that the president of GM, Tony HAKIMIAM (sic), had told them to bill in this manner. Horzempa was told that if he did not follow these instructions, he would be fired. Horzempa was also personally instructed by Tony HAKIMIAM (sic) to install universal molding but charge for premium molding on vehicles.

60. Later in Horzempa's employment, he was instructed to bill for the most expensive part and to install that part onto the vehicle, regardless of whether it were the actual replacement part. For example, if a vehicle had an unheated windshield or one without a built-in antenna that needed to be replaced, Horzempa would install and bill for the more costly heated or antenna-equipped

23

windshield. Cochran explained to Horzempa that this change was implemented because "Tony has been shut down before due to insurance fraud out West and if he gets caught doing this again, it would ruin him for life." Cochran said that at least this way, if the insurance company ever sent an investigator to inspect the vehicle, they would see the wire and know that they were billed properly for the type of windshield that was installed.

61. I have spoken to former SFI-SIU Claims Representative/Investigator Mullins who advised that he was referred the Glass Masters case from Keith Pearce of SFI-SIU who had been investigating GM for billing irregularities occurring in the Pensacola, Florida area. Mullins conducted several interviews and a physical inspection of a sampling of claims which had originated in the Huntsville and Birmingham, Alabama areas. Upon conclusion of the inspections, Mullins could not substantiate that the billing practices asserted by Horzempa and seen in the Pensacola area were present in his area of responsibility in Alabama. In addition, Horzempa was not able to provide Mullins with documentation supporting his assertions since he was no longer employed with the company. Mullins felt this hampered his investigation and closed his case.

### TELEPHONIC COMPLAINT

62. On May 22, 2002, an individual telephonically contacted the Pensacola Field Office of the FDI-DIF and advised that he/she was an employee or ex-employee of GM in Alabama. This individual further advised that the local GM shop in Pensacola was improperly charging insurance companies for expensive grade windshields (i.e. heated, heads-up display, privacy glass) while installing the basic, inexpensive ones. The individual agreed to come to the FDI-DIF for an interview but failed to show up for the appointment. He/She later explained that he/she wanted to remain anonymous and that he/she had a good job with GM and some of his friends also worked for the company. The case was subsequently closed due to the lack of cooperation from the complainant.

24

## CONCLUSION

63.  As set forth above, and based upon all of the facts and circumstances described in this affidavit, along with my training, experience, and consultations with others, there is probable cause to believe that MEHRDAD "TONY" HAKIMIAN, EMMA DEGUZMAN, ALDY ANTONIO, AND BOBBY GUINTO, engaged in a conspiracy to commit wire fraud and committed wire fraud in violation of United States Code, Title 18 § 371 and § 1343.  These individuals defrauded insurance companies by fraudulently inflating invoices, and/or instructing others to do so, for vehicle windows/windshields and installation materials before being submitted to insurance companies or third party administrators for processing and payment.  These revisions fraudulently inflated the costs associated with replacing vehicle windows/windshields by reflecting that premium grade glass (and installation materials) was installed when, in fact, it was not.

64.  Since this investigation is continuing, disclosure of the contents of this affidavit will jeopardize the progress of the investigation.  Accordingly, I respectfully request that the Court issue an order pursuant to which this Application, the Supporting Affidavit, and Attachments be filed under seal until further order of this Court.

William Leoni
Special Agent
Federal Bureau of Investigation
San Francisco Division
Concord, California Resident Agency

Subscribed and sworn to before me on this 31st day of October, 2007.

EDWARD M. CHEN
United States Magistrate Judge

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☑ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT
                                    ☐ SUPERSEDING

| Name of District Court, and/or Judge/Magistrate Location |
| NORTHERN DISTRICT OF CALIFORNIA |

### OFFENSE CHARGED

18 USC § 371 - Conspiracy
18 USC § 1343 - Fraud

☐ Petty
☐ Minor
☐ Misde-meanor
☑ Felony

**PENALTY:**

18 USC § 371: 0-5 yrs imprisonment, 0-3 yrs supervised release, $250,000 fine, $100 special assessment
18 USC § 1343: 0-30 yrs. imprisonment, 0-3 yrs supervised release, $1,000,000 fine, $100 special assessment

### DEFENDANT - U.S.

▶ MEHRDAD HAKIMIAN

FILED
OCT 31 2007

DISTRICT COURT NUMBER
4:07-70654 WDB

### PROCEEDING

Name of Complaintant Agency, or Person (&Title, if any)
FEDERAL BUREAU OF INVESTIGATION

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
    ☐ U.S. Att'y ☐ Defense

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

SHOW
DOCKET NO.

MAGISTRATE
CASE NO.

Name and Office of Person
Furnishing Information on
THIS FORM

**SCOTT N. SCHOOLS**

☑ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y
(if assigned)   STEPHEN G. CORRIGAN

### DEFENDANT

**IS NOT IN CUSTODY**

1) ☑ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges            } ☐ Fed'l ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer
been filed?    ☐ Yes   If "Yes"
               ☐ No    give date
                       filed

Month/Day/Year

**DATE OF
ARREST** ▶                Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED
TO U.S. CUSTODY** ▶         Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

**PROCESS:**
☑ SUMMONS  ☐ NO PROCESS*  ☐ WARRANT   Bail Amount:

If Summons, complete following:
☐ Arraignment  ☑ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Defendant Address:
1 DeSilva Island Court
Mill Valley, CA 94941

Date/Time: Nov. 7, 2007 at 10:00 am

Before Judge: U.S. Magistrate Judge Wayne D. Brazil

Comments:

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☑ COMPLAINT ☐ INFORMATION ☐ INDICTMENT ☐ SUPERSEDING

| Name of District Court, and/or Judge/Magistrate Location |
|---|
| NORTHERN DISTRICT OF CALIFORNIA |

---

**OFFENSE CHARGED**

18 USC § 371 - Conspiracy
18 USC § 1343 - Fraud

☐ Petty
☐ Minor
☐ Misde-meanor
☑ Felony

**PENALTY:**

18 USC § 371: 0-5 yrs imprisonment, 0-3 yrs supervised release, $250,000 fine, $100 special assessment
18 USC § 1343: 0-30 yrs. imprisonment, 0-3 yrs supervised release, $1,000,000 fine, $100 special assessment

---

**DEFENDANT - U.S.**

**FILED**

▶ EMMA DEGUZMAN

OCT 3 1 2007

DISTRICT COURT NUMBER
4:07-70654 WDB

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

---

**PROCEEDING**

Name of Complaintant Agency, or Person (&Title, If any)
FEDERAL BUREAU OF INVESTIGATION

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:     SHOW
    ☐ U.S. Att'y ☐ Defense     DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under     MAGISTRATE CASE NO.

Name and Office of Person
Furnishing Information on
THIS FORM     **SCOTT N. SCHOOLS**
☑ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y
(if assigned)    STEPHEN G. CORRIGAN

---

**DEFENDANT**

**IS *NOT* IN CUSTODY**

1) ☑ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges } ☐ Fed'l ☐ State

If answer to (6) is "Yes", show name of Institution

Has detainer been filed? ☐ Yes ☐ No } If "Yes" give date filed _____

DATE OF ARREST ▶    Month/Day/Year _____

Or... If Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶    Month/Day/Year _____

☐ This report amends AO 257 previously submitted

---

**ADDITIONAL INFORMATION OR COMMENTS**

**PROCESS:**
☑ SUMMONS ☐ NO PROCESS* ☐ WARRANT     Bail Amount: _____

If Summons, complete following:
☐ Arraignment ☑ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Defendant Address:
2223 Peacock Place, #4
Union City, CA 94587

Date/Time: Nov. 7, 2007 at 10:00 am

Before Judge: U.S. Magistrate Judge Wayne D. Brazil

Comments:

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☑ COMPLAINT   ☐ INFORMATION   ☐ INDICTMENT   ☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA

### OFFENSE CHARGED

18 USC § 371 - Conspiracy
18 USC § 1343 - Fraud

☐ Petty
☐ Minor
☐ Misde-meanor
☑ Felony

**PENALTY:**

18 USC § 371: 0-5 yrs imprisonment, 0-3 yrs supervised release, $250,000 fine, $100 special assessment
18 USC § 1343: 0-30 yrs. imprisonment, 0-3 yrs supervised release, $1,000,000 fine, $100 special assessment

### DEFENDANT - U.S.

ALDY ANTONIO

DISTRICT COURT NUMBER
4:07-70654 WDB

**FILED**

OCT 3 1 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

### PROCEEDING

Name of Complaintant Agency, or Person (&Title, if any)
FEDERAL BUREAU OF INVESTIGATION

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y ☐ Defense

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

SHOW DOCKET NO.

MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on THIS FORM
**SCOTT N. SCHOOLS**
☑ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned)   STEPHEN G. CORRIGAN

### DEFENDANT

**IS NOT IN CUSTODY**

1) ☑ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges     } ☐ Fed'l ☐ State

If answer to (6) is "Yes", show name of Institution

Has detainer been filed?   ☐ Yes  ☐ No   } If "Yes" give date filed

**DATE OF ARREST**   Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY**   Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS   ☐ NO PROCESS*   ☑ WARRANT   Bail Amount:  NO BAIL

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance
Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:

Before Judge:

Comments:

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☑ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT  ☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA

**FILED**
OCT 3 1 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

### OFFENSE CHARGED
18 USC § 371 - Conspiracy
18 USC § 1343 - Fraud

☐ Petty
☐ Minor
☐ Misde-meanor
☑ Felony

PENALTY:
18 USC § 371: 0-5 yrs imprisonment, 0-3 yrs supervised release, $250,000 fine, $100 special assessment
18 USC § 1343: 0-30 yrs. imprisonment, 0-3 yrs supervised release, $1,000,000 fine, $100 special assessment

### DEFENDANT - U.S.
▶ BOBBY GUINTO

DISTRICT COURT NUMBER
4:07-70654 WDB

### PROCEEDING
Name of Complaintant Agency, or Person (&Title, If any)
FEDERAL BUREAU OF INVESTIGATION

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
  ☐ U.S. Att'y  ☐ Defense

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

SHOW DOCKET NO.

MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on THIS FORM
**SCOTT N. SCHOOLS**
☑ U.S. Att'y  ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned)  STEPHEN G. CORRIGAN

### DEFENDANT

**IS NOT IN CUSTODY**
1) ☑ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges
2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges
  }  ☐ Fed'l  ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer been filed?  ☐ Yes  ☐ No  }  If "Yes" give date filed

**DATE OF ARREST**  Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY**  Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☑ SUMMONS  ☐ NO PROCESS*  ☐ WARRANT   Bail Amount:

If Summons, complete following:
☐ Arraignment  ☑ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Defendant Address:
3729 McGee Ave.
Oakland, CA

Date/Time: Nov. 7, 2007 at 10:00 am

Before Judge: U.S. Magistrate Judge Wayne D. Brazil

Comments: